UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

GILEAD SCIENCES, INC. and GILEAD
SCIENCES IRELAND UC,

                        Plaintiffs,

               v.

PAIN RELIEF RX, INC.; KHAIM
MULLOKANDOV; LUMIX PHARMACY INC.;
ARIEL LEVY; RICHARD GALANTI; ALEX
LEVY; DANIEL LEVY; GALAXY PHARMACY
INC.; GERDA SHIMUNOVA; CLEARRX
PHARMACY INC.; BENJAMIN LEVY; EZ MAX
PHARMACY INC.; ZOYA MEIROV; MDRX
PHARMACY INC.; MARINA DAVIDOV;
SKYRX PHARMACY INC.; SUSANA LEVY;
SPECTRA PHARMACY INC.; DAVID LEVY; ;
LINDEN BLVD. RX INC.; JONATHAN
ABRAMOV; TRINITY GLOBAL PHARMACY
LLC d/b/a MICHAEL'S PHARMACY; MICHAEL
KALDAS; SELVIA GIRGIS; and SILDEVIE
TCHIEKOUA NGUETCHO.

                        Defendants.

---------------------------------------------------------- X

Case No. _____

**FILED *EX PARTE* AND UNDER SEAL PURSUANT TO 15 U.S.C. § 1116(d)**

## COMPLAINT AND JURY DEMAND

Plaintiffs Gilead Sciences, Inc. and Gilead Sciences Ireland UC (together, "Gilead" or "Plaintiffs"), by and through their counsel, Patterson Belknap Webb & Tyler LLP, for their Complaint against the Defendants listed above allege as follows:

### SUMMARY OF THE ACTION

1.     Gilead brings this suit to put an immediate halt to the sale of counterfeit and infringing Gilead-branded HIV medicines being sold online by fraudulent retail pharmacies in this District and distributed throughout the nation.

1

2.      The Defendants in this matter are licensed pharmacies – at least in name – their principals, and their supervising pharmacists.  All are participants of an illicit scheme to sell and distribute counterfeit, infringing, black-market versions of Gilead-branded HIV medicines through online pharmacy-to-pharmacy platforms (the "Platforms").

3.      These Platforms operate online marketplaces by which licensed pharmacies can sell prescription drugs to other licensed pharmacies.  These Platforms are accessible only to member pharmacies who must provide proof of licensure to gain access to the site.  This means that, by design, sales of prescription drugs on these platforms are invisible to manufacturers, regulators, and law enforcement.  And even then, the Platforms typically keep the identity of selling pharmacies hidden until the transaction is completed and the prescription drugs arrive at the purchasing pharmacy in the mail.  Defendants leverage this opacity to sell counterfeit and infringing Gilead-branded HIV medicines to independent retail pharmacies across the country, at large volumes and at too-good-to-be-true prices.

4.      The Defendants' scheme begins by targeting vulnerable patients with valid prescriptions who received their prescribed Gilead-branded HIV medicines for little or no cost, and convincing them to resell their medicines for cash on the black market.

5.      Defendants or their co-conspirators alter the street-purchased medicines to conceal their black-market origins, including by removing the patient labeling placed on the bottles by the originally dispensing pharmacy.  This makes the black-market medicines appear to be new, authentic Gilead-branded medicines, despite the fact that they had been dispensed to patients and held by them and others under unknown conditions for unknown periods of time.

6.      Defendants then fraudulently advertise and sell these altered and counterfeit medicines as new, authentic Gilead products to other pharmacies via online "pharmacy-to-

2

pharmacy" Platforms, distributing them to pharmacies throughout the United States, where they eventually end up in the hands of unsuspecting patients.

7.      In furtherance of the scheme, the Defendants hold themselves out as legitimate brick-and-mortar retail pharmacies, pharmacy owners, and pharmacists.  They even maintain storefronts in this District to make it appear that they are real, operating mom-and-pop pharmacies serving their neighborhoods.  But that is all just part of the fraud.  In reality, none of the Defendants is actually running a retail pharmacy.  They rent storefronts and install signage, but the pharmacies' shelves are either empty or barely stocked and their doors are never open. These phantom "pharmacies" exist for the purpose of selling counterfeit and infringing HIV medicines online.

8.      Gilead brings this action first and foremost to protect patients.  Every infringing bottle represents a vulnerable patient who has been deprived of their prescribed HIV medicine by being convinced to sell it on the black market.  And the pharmacies who buy from Defendants on the Platforms dispense the medicines to unsuspecting patients, who pay full price for what they believe are authentic Gilead-branded HIV medicines, but are actually inauthentic, black-market products.

9.      In this action, Gilead seeks injunctive relief, including seizures under the Lanham Act, to put an immediate stop to the sale of these counterfeit and infringing medicines.  Gilead also seeks other injunctive and monetary relief against all Defendants for trademark infringement in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114); false descriptions and false designations of origin in commerce in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125); false advertising in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125);;

3

deceptive business practices in violation of New York General Business Law § 349; and common-law unjust enrichment and unfair competition.

### THE PARTIES

A.    **PLAINTIFFS**

10.    Plaintiff Gilead Sciences, Inc. is a public corporation organized under the laws of the State of Delaware, with more than 17,000 employees.  Its principal place of business is 333 Lakeside Drive, Foster City, California 94404.  Gilead develops and markets a large portfolio of lifesaving medications, including drugs for the treatment or prevention of HIV.  Gilead is the owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, pedigree information, and instructional outserts of certain genuine HIV and other medicines.

11.    Plaintiff Gilead Sciences Ireland UC ("Gilead Ireland") is a private unlimited company organized under the laws of Ireland, with its principal place of business at IDA Business & Technology Park, Carrigtohill, Co. Cork, Ireland.  Gilead Sciences, Inc. is the ultimate parent of Gilead Ireland.  Gilead Ireland is the owner of certain well-established and famous registered trademarks that appear on the packaging (including the pedigrees), tablets, and instructional outserts of certain genuine HIV and other medicines.

B.    **DEFENDANTS**

1.    **The Pain Relief Defendants**

12.    Defendant Pain Relief Rx, Inc. ("Pain Relief") is a purported retail pharmacy incorporated in New York with a principal place of business in Middle Village, Queens, New York.  Defendant Pain Relief Rx sold counterfeit and infringing Gilead-branded HIV medicines.

13.    Defendant Khaim Mullokandov is an individual residing in Queens, New York. He is the principal of record of Pain Relief Rx.  Khaim Mullokandov supervised, ratified, and/or

4

personally participated in the trafficking of counterfeit and infringing Gilead-branded medicines. As principal of Pain Relief Rx, he personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded medicines and failed to exercise his authority to stop it.

14.     Defendant Eleanora ("Ella") Mullokandova (together with Pain Relief and Khaim Mullokandov, the "Pain Relief Rx Defendants") is an individual residing in Queens, New York. She acts as the manager and supervisor of Pain Relief.  Ella Mullokandov supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded medicines.  As manager and supervisor of Pain Relief Rx, she personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded medicines and failed to exercise her authority to stop it.

**2.      The Lumix Pharmacy Inc. Defendants**

15.     Defendant Lumix Pharmacy Inc. ("Lumix") is a purported retail pharmacy incorporated in New York with a principal place of business in Woodhaven, Queens, New York. Defendant Lumix sold counterfeit and infringing Gilead-branded HIV medicines.

16.     Defendant Ariel Levy is an individual residing in Rego Park, Queens, New York. He is the principal of record of Defendant Lumix.  Levy supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded medicines.  As principal of Defendant Lumix, he personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded medicines and failed to exercise his authority to stop it.

17.     Defendant Richard Galanti (together with Lumix and Ariel Levy, the "Lumix Defendants") is an individual residing in Naples, Florida.  Galanti is the supervising pharmacist of Lumix.  Among other things, supervising pharmacists are individually responsible for

ensuring a pharmacy's compliance with the Drug Supply Chain Security Act ("DSCSA") and other laws and ensuring the authenticity of medicines purchased and sold by a pharmacy under their supervision. As the supervising pharmacist of Lumix, Galanti supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded HIV medicines. Galanti also personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded HIV medicines and failed to exercise his authority to stop it.

### 3.    The Levy Family Defendants

18.    Defendant Galaxy Pharmacy Inc. ("Galaxy") is a purported retail pharmacy incorporated in New York with a principal place of business in Astoria, Queens, New York. Defendant Galaxy sold counterfeit and infringing Gilead-branded HIV medicines.

19.    Defendant Gerda Shimunova is an individual residing in Queens, New York. She is the principal of record of Defendant Galaxy. Gerda Shimunova supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded HIV medicines. As principal of Defendant Galaxy, she personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded HIV medicines and failed to exercise her authority to stop it.

20.    Defendant ClearRx Pharmacy Inc. ("ClearRx") is a purported retail pharmacy incorporated in New York with a principal place of business in Queens, New York. Defendant ClearRx sold counterfeit and infringing Gilead-branded HIV medicines.

21.    Defendant Benjamin Levy is an individual residing in Queens, New York. He is the principal of record of Defendant ClearRx. Benajmin Levy supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded medicines. As principal of Defendant ClearRx, he personally financially benefited from the trafficking of

6

counterfeit and infringing Gilead-branded medicines and failed to exercise his authority to stop it.

22.     Defendant Ez Max Pharmacy Inc. ("Ez Max") is a purported retail pharmacy incorporated in New York with a principal place of business in Glendale, Queens, New York. Defendant Ez Max sold counterfeit and infringing Gilead-branded HIV medicines.

23.     Defendant Zoya Meirov (née Levy) is an individual residing in Queens, New York.  She is the principal of record of Defendant Ez Max.  Zoya Meirov is the sister of Alex and Daniel Levy.  Zoya Meirov supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded HIV medicines.  As principal of Defendant Ez Max, she personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded HIV medicines and failed to exercise her authority to stop it.

24.     Defendant MDRx Pharmacy Inc. ("MDRx") is a purported retail pharmacy incorporated in New York with a principal place of business in Astoria, Queens, New York. Defendant MDRx sold counterfeit and infringing Gilead-branded HIV medicines.

25.     Defendant Marina Davidov (née Levy) is an individual residing in Queens, New York.  She is the principal of record of Defendant MDRx.  Marina Davidov supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded HIV medicines.  As principal of Defendant MDRx, she personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded HIV medicines and failed to exercise her authority to stop it.

26.     Defendant SkyRx Pharmacy Inc. ("SkyRx") is a purported retail pharmacy incorporated in New York with a principal place of business in Astoria, Queens, New York. Defendant SkyRx sold counterfeit and infringing Gilead-branded HIV medicines.

27.     Defendant Susana Levy is an individual residing in Queens, New York.  She is the principal of record of Defendant SkyRx.  Susana Levy supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded HIV medicines.  As principal of Defendant SkyRx, she personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded HIV medicines and failed to exercise her authority to stop it.

28.     Defendant Spectra Pharmacy Inc. ("Spectra") is a purported retail pharmacy incorporated in New York with a principal place of business in Astoria, Queens, New York.  Defendant Spectra sold counterfeit and infringing Gilead-branded HIV medicines.

29.     Defendant David Levy is an individual residing in Queens, New York.  He is the principal of record of Defendant Spectra.  David Levy supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded HIV medicines.  As principal of Defendant Spectra, he personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded HIV medicines and failed to exercise his authority to stop it.

30.     Defendant Alex Levy is an individual residing in Queens, New York.  Alex Levy coordinated and supervised the scheme by which different members of his immediate family opened and closed purported retail pharmacies in order to sell counterfeit and infringing Gilead-branded medicines online.  Alex Levy supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded HIV medicines through these pharmacies.  Alex Levy personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded HIV medicines, and failed to exercise his authority to stop it.

8

31.    Defendant Daniel Levy is an individual residing in Queens, New York.  Daniel Levy is Alex Levy's brother.  Daniel Levy coordinated and supervised the scheme by which different members of his immediate family opened and closed purported retail pharmacies in order to sell counterfeit and infringing Gilead-branded medicines online.   Daniel Levy supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded HIV medicines through these pharmacies.  Daniel Levy personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded HIV medicines, and failed to exercise his authority to stop it.

**4.    The Linden Defendants**

32.    Defendant Linden Pharmacy Inc. ("Linden") is a purported retail pharmacy incorporated in New York with a principal place of business in Elmont, New York.  Defendant Linden sold counterfeit and infringing Gilead-branded HIV medicines.

33.    Defendant Jonathan Abramov (together with Linden, the "Linden Defendants") is an individual residing in Fresh Meadows, New York.  He is the principal of record of Defendant Linden.  Abramov supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded medicines.  As principal of Linden, he personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded medicines and failed to exercise his authority to stop it.

**5.    The Michael's Pharmacy Defendants**

34.    Defendant Trinity Global Pharmacy LLC, d/b/a Michael's Pharmacy ("Michael's Pharmacy") is a retail pharmacy incorporated in New Jersey with its principal place of business in Newark, New Jersey.  Defendant Michael's Pharmacy sold counterfeit and infringing Gilead-branded HIV medicines.

9

35.    Defendant Michael Kaldas is an individual living in Caldwell, New Jersey.  He is the principal of record of Defendant Michael's Pharmacy.  Kaldas supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded medicines.  As the principal of Michael's Pharmacy, he personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded medicines and failed to exercise his authority to stop it.

36.    Defendant Selvia Girgis is an individual residing in New Jersey.  She is a co-owner of Michael's Pharmacy and its vice president.  Girgis supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded medicines.  As the co-owner of Michael's Pharmacy, she personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded medicines and failed to exercise her authority to stop it.

37.    Defendant Sildevie Tchiekoua Nguetcho (together with Michael's Pharmacy, Michael Kaldas, and Selvia Girgis the "Michael's Pharmacy Defendants") is an individual residing in Hackettstown, New Jersey.  Nguetcho is the supervising pharmacist of Michael's Pharmacy.  Among other things, supervising pharmacists are individually responsible for ensuring a pharmacy's compliance with the DSCSA and other laws and ensuring the authenticity of medicines purchased and sold by a pharmacy under their supervision.  As the supervising pharmacist of Michael's Pharmacy, Nguetcho supervised, ratified, and/or personally participated in the trafficking of counterfeit and infringing Gilead-branded HIV medicines.  Nguetcho also personally financially benefited from the trafficking of counterfeit and infringing Gilead-branded HIV medicines and failed to exercise her authority to stop it.

## JURISDICTION AND VENUE

38.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 1121(a), 1331, 1338, and 1367 and general principles of ancillary and pendent jurisdiction.

39.     The Court has personal jurisdiction over each of the Defendants because each of the Defendants has sufficient minimum contacts with New York and with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

40.     As alleged herein, all Defendants are residents of or have minimum contacts with New York.

41.     As alleged herein, all Defendants transacted business in New York and committed tortious acts in New York.  In particular, each Defendant sold counterfeit and infringing Gilead-branded HIV medicines to at least one pharmacy located in New York.

42.     All individual Defendants other than Galanti, Kaldas, Girgis, and Nguetcho live in and are residents of New York.  All corporate Defendants other than Michael's Pharmacy are incorporated in and have their principal places of business in New York.

43.     Defendant Galanti has minimum contacts with New York, as he serves as the supervising pharmacist of Lumix, which is incorporated and operates in New York, and participated in, supervised, and/or ratified the sale of infringing and counterfeit Gilead-branded medicine to at least one pharmacy in New York.

44.     Defendants Kaldas, Girgis, and Nguetcho have minimum contacts with New York as the owners and supervising pharmacist of Michael's Pharmacy and participated in, supervised, and/or ratified the sale of infringing and counterfeit Gilead-branded HIV medicines to at least one pharmacy in New York.

45.     Defendant Michael's Pharmacy has minimum contacts with New York because it sold infringing and counterfeit Gilead-branded HIV medicines to at least one pharmacy in New York.

46.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2) because Defendants sold or conspired to sell counterfeit or infringing products in this District, because the majority of Defendants reside in and sold counterfeit and infringing products from this District, and thus a substantial part of the events giving rise to Gilead's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.     GILEAD'S TRADEMARKS

47.     Gilead is the owners of a number of well-established and famous registered trademarks (the "Gilead Marks") that appear on its genuine medicines.  A complete list of these trademarks is set forth in **Exhibit A** hereto, which is incorporated by reference.  Gilead also owns and uses distinctive packaging (the "Gilead Trade Dress") to distinguish its medicines in the marketplace.

48.     Gilead has used and/or currently is using the Gilead Marks and the Gilead Trade Dress in commerce in connection with its sale of medicines, including by prominently displaying the Gilead Marks and Gilead Trade Dress in its advertising and promotional materials.  For its medicines currently offered and marketed in the United States, including BIKTARVY® and DESCOVY®, Gilead plans to continue such use in the future.

49.     Gilead has engaged and continues to engage in activities designed to promote its medicines and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, and copyrights throughout the United States.

All of these trademarks and trade dress symbolize business goodwill of Gilead and are invaluable assets to Gilead.

**B.    GILEAD-BRANDED MEDICINES**

50.    For more than three decades, Gilead has strived to create a healthier world for all by delivering innovative therapies to prevent, treat, or cure life-threatening diseases. Gilead relentlessly pursues advancements in science with the goal of bringing to patients around the world treatments that improve care in areas of unmet medical needs.

51.    Gilead has transformed care for people living with serious diseases, such as HIV and hepatitis C, developing pioneering medicines including the world's first single tablet regimen to treat HIV, the first prophylactic medicine to prevent HIV infection, and four hepatitis C therapies.

**1.    Gilead's HIV Medicines**

52.    BIKTARVY® is a complete, one-pill, once-a-day prescription medicine used to treat HIV.  Developed by Gilead and first approved by the FDA in 2018, BIKTARVY® is a single-tablet combination medicine for the treatment of HIV-1 infection, combining an unboosted integrase strand transfer inhibitor called bictegravir with Gilead's dual nucleoside reverse transcriptase inhibitors, emtricitabine and tenofovir alafenamide, the components of another Gilead medicine approved by the FDA: DESCOVY® (also called DESCOVY for PrEP®, discussed below).

53.    BIKTARVY® has demonstrated long-term efficacy and safety; it has few drug interactions and side effects and has a high barrier to developing drug resistance.

54.    Although BIKTARVY® does not cure HIV, when taken every day as prescribed, it can lower the amount of virus in a patient's blood to undetectable levels.  In addition to halting the progression of HIV, research shows that having undetectable levels of the virus prevents

transmission of HIV through sex, protecting a patient's sexual partners (and thus the broader community) from possible transmission.

55.     BIKTARVY® also can help increase a patients' CD4 T-cell count.  CD4 T-cells are an important part of a person's immune system.  HIV attacks and destroys CD4 T-cells, which decreases a patient's ability to fight off other infections, which can lead to serious illness or death.  Indeed, a diagnosis of AIDS – the most advanced stage of HIV – is based on low levels of CD4 T-cells and/or the presence of opportunistic infections.  AIDS is deadly particularly because those suffering from it cannot fight off other infections.  Thankfully, medicines like BIKTARVY®, when taken correctly, can stop the progression of an HIV infection and protect patients' immune systems.

56.     One of the most significant developments in the fight against HIV is the development of drugs for pre-exposure prophylaxis, or "PrEP": a method of HIV prevention whereby individuals who are HIV-negative but at-risk for HIV infection proactively take medicine on an ongoing basis to decrease their risk of acquiring HIV.

57.     DESCOVY for PrEP® is a therapy developed and manufactured by Gilead that can be taken for PrEP.  The drug comes in the form of a tablet.  The dosage in the FDA approved label is one tablet per day.

58.     When taken as indicated, DESCOVY for PrEP® is highly effective at preventing HIV-1 infection in individuals exposed to the virus.

59.     DESCOVY for PrEP® was approved by the FDA in 2019.[1]  It has been an instrumental part of preventing the spread of HIV in areas in the United States where there is a high prevalence of HIV, including New York City.

---

[1] DESCOVY for PrEP® has not been approved for use in those who were assigned the female sex at birth.

14

### 2.      Packaging and Outserts

60.     All Gilead-branded HIV medicines, including BIKTARVY® and DESCOVY®, must be sold and dispensed in their original manufacturer containers; they may not be dispensed in generic pharmacy bottles.

61.     All authentic Gilead-branded HIV medicines, including BIKTARVY® and DESCOVY®, are sold and distributed with FDA-approved and -required patient information booklets, which are machine-folded and affixed to the side of the bottle with adhesive.  These patient information documents are often referred to as "outserts" (as opposed to an "insert" that is placed inside a carton).

62.     The Patient Information outserts contain crucial patient-care information, such as information about the drug regimen, tables providing drug interactions and contraindications, important warnings, and ways patients may contact Gilead and the FDA.  These outserts are a crucial component of the product that Gilead sells.

### 3.      Gilead's Secure Supply Chain

63.     In the United States, the only distributors to whom Gilead sells Gilead-branded medicines are a small list of trusted Gilead-authorized distributors, who are listed on Gilead's website.[2]

64.     As is common in the industry, Gilead sells each of its medicines, including BIKTARVY® and DESCOVY®, at a single list price to all of its authorized distributors, known as the wholesale acquisition cost or "WAC."

65.     Because Gilead is the only source of Gilead-branded medicines like BIKTARVY® and DESCOVY®, and Gilead sells to all of its authorized distributors at WAC,

---

[2] https://www.gilead.com/medicines/authorized-distributors

there is no legitimate reason why a pharmacy would be selling Gilead-branded products en masse at prices significantly below WAC on online Platforms. Platform sales at below-WAC pricing are a significant red flag.

66. Basic principles of economics dictate that the price of medicines generally goes up, not down, as products move down the supply chain from manufacturers to distributors to retailers. Moreover, there are significant costs associated with selling drugs on pharmacy-to-pharmacy Platforms, which generally charge the selling pharmacy fees of 10% or more of the sales price. Moreover, Gilead allows pharmacies to return near-expired (and already-expired, up to a year after expiry) Gilead-branded medicines for credit.

67. Simply put, if pharmacies were purchasing authentic Gilead-branded medicines through the legitimate supply chain and then selling them on the Platforms at below-WAC prices, the pharmacy would suffer a significant loss on each and every sale.

### 4. Pedigree Information

68. As established by the Drug Supply Chain Security Act ("DSCSA"), 21 U.S.C. § 360eee *et seq.*, and its implementing regulations, all transfers of a unit of prescription medicine in the United States must be tracked and verified through what is referred to in the industry as "pedigree" information. Pedigree information includes, for each transfer of a salable unit of medicine, identifying information about the particular unit of medicine, details about who bought and sold the unit, and an affirmation that the unit was purchased from an authorized trading partner.

69. Historically, this information was set forth in a document, often saved as a PDF file, that accompanied the unit of medicine as it changed hands; more recently, the information has been transmitted and saved electronically via what is known as the EPCIS system.

70.     Whether transmitted as a document or as information in the EPCIS electronic system, accurate pedigree information is an important component of Gilead-branded HIV medicines.  Pedigree information also plays an important role in Gilead's quality-control procedures.  Among other things, Gilead uses pedigrees to identify diverted and counterfeit product.  When investigating a suspect unit of Gilead-branded medicine – *e.g.*, when a patient or pharmacy inquires about a bottle's authenticity, Gilead's quality-control protocol is to request the pedigree information for that unit of medicine, so Gilead can identify and investigate the distribution chain of the unit.  Pharmacies that do not provide pedigree information or provide falsified pedigree information undermine Gilead's ability to investigate and address suspect products.

71.     Counterfeit or diverted medicines, such as already-dispensed medicines that are purchased from patients and resold as new, by definition cannot have valid pedigree information.  For example, a valid pedigree cannot state that the unit was purchased from a patient.

**5.      Product Identifying Information and Targeted Recalls**

72.     In the United States, the labeling of all Gilead-branded medicines bear, among other things: (1) the unit's expiration date; and (2) the unit's serial number, lot number, and global trade item number ("GTIN"), which in combination is unique to that particular unit of medicine.  For Gilead-branded HIV medicines like BIKTARVY® and DESCOVY®, that information appears on what is known as the "variable print area" of the label on the bottle.  Gilead uses these identifiers to monitor the quality of its medicines, track issues and complaints, and perform recalls.

73.      Gilead has substantial quality-assurance protocols related to the issuance of a targeted recall in the event of a quality concern about any released lot of Gilead-branded

17

medicine.  Gilead's protocols provide that recall notices will be provided to the distributors and other entities to which Gilead knows the affected lot was distributed.

74.    If a product subject to recall was diverted from the legitimate supply chain – for example, by being dispensed to a patient, illegally repurchased from the patient, and then resold to another pharmacy – Gilead's targeted recall procedures would be undermined, as the subsequent pharmacy and/or patient who received that illegitimate unit would be unknown to Gilead and its distributors.

75.    Issuing non-targeted recalls – for example, by sending a recall notice to every pharmacy in the country – would be doubly problematic.  First, it would confuse pharmacies and distributors, who might erroneously believe the recall applied to them, or who would question why they were receiving an inapplicable recall notice, which may impact future purchasing decisions.  Second, receiving inapplicable recall notices would have the proverbial "boy who cried wolf" effect, making it less likely that U.S. pharmacies would pay attention in the future to any recall notices that are actually applicable to medicines they purchased or dispensed.

## C.    THE PHARMACY-TO-PHARMACY PLATFORMS

76.    Defendants sold diverted, misbranded, infringing, and counterfeit Gilead-branded HIV medicines on at least four Platforms: (1) www.InStockRx.com ("InStockRx"); (2) www.Rxeed.com ("Rxeed"); (3) www.Rx-Post.com ("RxPost"); and (4) www.RxWorld.com ("RxWorld").  Numerous other Platforms exist.

77.    Each Platform is only open to and accessible by member pharmacies.  To join the Platform as either a buyer or seller, a pharmacy must provide proof of licensure.

78.    The Platforms facilitate payment for the prescription drugs being offered on their site and charge a fee on each sale transacted.  The fee is usually a percentage of the sale price.

79. The Platforms host sales listings that permit member pharmacies to offer medicines to other member pharmacies. Typically, the Platforms do not permit buyers to see the name of the pharmacy seller until a transaction is complete and the drugs are delivered.

80. By design, the prescription drugs being offered and sold on the Platforms are invisible to manufacturers, regulators, and law enforcement.

81. Even when Gilead secured the assistance of a cooperating pharmacist with access to Platform listings, because the Platforms conceal the identity of the selling pharmacies until after purchase, it was impossible to monitor or target the listings of any particular seller on most Platforms, let alone across all Platforms.

## D. DEFENDANTS' SALE OF COUNTERFEIT AND INFRINGING GILEAD-BRANDED HIV MEDICINES

### 1. The Pain Relief Defendants

82. Khaim Mullokandov owns Pain Relief and registered it as a pharmacy in November 2020.

83. Ella Mullokandov is Pain Relief's manager and supervisor. She has testified on behalf of the company in prior litigations, and she writes checks on behalf of Pain Relief from the company bank account, including checks to herself.

84. Although Pain Relief ostensibly operates as a retail pharmacy in Middle Village, Queens, New York, Pain Relief has no supervising pharmacist. It is unlawful for a pharmacy in New York to dispense medicines without a supervising pharmacist.

### a. Pain Relief's Sale of Counterfeit and Infringing HIV Medicines

85. In December 2025, a cooperating pharmacist in this District conducted a search of InStockRx for Gilead-branded HIV medicines. The cooperating pharmacist located a listing for a unit of BIKTARVY® available for $1,999.00, approximately a 53% discount off WAC. The

cooperating pharmacist purchased the bottle of BIKTARVY®, and when it arrived, the accompanying invoice identified Pain Relief as the seller.

86.     The bottle of BIKTARVY® bore the serial number 554735942723 and arrived dirty and damaged, with visible signs that it had previously been dispensed to a patient.  As shown below, the bits of ink had been lifted or removed from the original Gilead label, including on the barcode, consistent with the removal of a pharmacy-applied patient label.  Bits of residue consistent with the removal of a pharmacy-applied patient label were also visible on the bottle.



87.     The bottle also was missing its Patient Information outsert, with only two glue dots remaining from where the outsert had been affixed to the bottle.

88.    A search of Gilead's internal records indicated that the BIKTARVY® bearing serial number 554735942723 had been sold by Gilead to Gilead-authorized distributor McKesson.  Gilead submitted a trace request to McKesson, which confirmed that the unit had been sold to a pharmacy in Philadelphia, Pennsylvania.  That pharmacy confirmed that it had dispensed that unit of BIKTARVY® to a patient in October 2025.  And yet Pain Relief in Queens sold that same bottle online two months later.

89.    In December 2025, the cooperating pharmacist also searched RxPost for Gilead-branded HIV medicines.  The cooperating pharmacist found a listing for BIKTARVY® for $1,999.00, representing an approximate 53% discount off WAC, and a listing for DESCOVY® for $1,099.00, representing an approximate 50% discount off WAC.  The cooperating pharmacist purchased both units and when they arrived, the accompanying invoices identified Pain Relief as the seller.

90.    The bottle of BIKTARVY® had several indicia of having been previously dispensed to a patient.  As shown below, the bottle of BIKTARVY® was missing its outsert; the bottle's original label had dots of lifted ink and a torn corner consistent with the removal of a pharmacy-applied patient label; the text on the variable-print area of the bottle was blurry and

smeared, consistent with the use of a solvent to remove a pharmacy-applied patient label and

clean the bottle; and a small area of sticky residue (circled in red below) remained on the bottle.





91.     As shown below, the bottle of DESCOVY® received from Pain Relief through

RxPost in December 2025 also arrived visibly dirty and damaged, with residue consistent with

22

the removal of a pharmacy-applied patient label.  The bottle was also missing its outserts but

retained the two glue dots where the outsert had previously been affixed to the bottle.





92.     After the units of BIKTARVY® and DESCOVY® sold by Pain Relief via RxPost

arrived, Gilead used the serial and lot numbers on each unit to confirm they had both been sold

by Gilead's authorized distributors through the legitimate supply chain to other pharmacies.

93.     Gilead's records confirmed that Gilead had sold the unit of BIKTARVY® to its

authorized distributor Cencora, which had distributed the unit to a pharmacy in Newark, NJ.

That pharmacy confirmed that it dispensed the unit to a patient in October 2025.

23

94.    Gilead's records confirmed that Gilead had sold the unit of DESCOVY® to its authorized distributor McKesson.  A tracing request to McKesson revealed that McKesson had subsequently sold the bottle to an independent pharmacy in Florida.

95.    The cooperating pharmacist attempted to contact Pain Relief to request the pedigree information for the Gilead-branded HIV medicines sold via the Platforms, but the calls went straight to voicemail and were never returned.

96.    Pain Relief's listings on the Platforms fraudulently advertised the medicines as new, authentic Gilead-branded medicines, and concealed that they had been previously dispensed to patients by other pharmacies.

97.    In sum, through test buys, Pain Relief sold multiple units of counterfeit and infringing Gilead-branded medicines to a pharmacy in this District that had been damaged and altered to conceal the fact that they had been previously dispensed to patients and purchased on the black market.

**b.    The Pain Relief Defendants are Recidivist Pharmaceutical Fraudsters**

98.    From 2022 to 2025, Pain Relief was sued by car insurance companies in an astonishing 91 lawsuits that alleged Pain Relief falsely submitted claims in connection with automobile accidents.  Falsely submitting claims against "no-fault" car insurance policies – which pay for medical bills regardless of who caused the accident – is a well-known fraudulent scheme perpetuated by bad-actor pharmacies.

99.    In early 2025, the arbitrator in one of the arbitrations involving Pain Relief summarized Ella Mullokandova's testimony on behalf of Pain Relief as follows: "Ms. Mullokandova was unable to answer pertinent questions regarding the company and its relationship with numerous medical facilities that send prescriptions for their No-Fault patients

24

to Pain Relief Rx Inc. The testimony also raised serious concerns regarding [Pain Relief's] billing practices and protocols."

100.    In a prior litigation in this District, *Gilead Sciences Inc. et al. v. Peter Khaim et al.*, Gilead identified a web of shell companies being used by Queens-based criminal counterfeiters of Gilead-branded HIV medicines to launder their ill-gotten gains.  Bank records show that shortly after receiving six-figure payments from online Platforms, the Pain Relief Defendants funneled hundreds of thousands of dollars through these same money-laundering entities.

### c.    Gilead Discovers that Pain Relief Is Not an Operating Retail Pharmacy

101.    As part of Gilead's counsel-led investigation, an investigator visited Pain Relief's retail store.  Despite it being normal weekday business hours, and within the limited "business hours" listed on the pharmacy's window, Pain Relief was closed, and most of its windows were covered.  Through an opening, the investigator was able to observe a partial view inside the store, where he observed a small amount of product on the shelves in what was otherwise a

25

mostly empty retail space that was inconsistent with an actually operating retail pharmacy, as shown in the photographs below.

 

102.    The investigator visited a neighboring business, where an employee confirmed that Pain Relief had not been open for years.

103.    In short, Pain Relief maintains an empty storefront to conceal the fact that it is a non-operational entity that exists for the purpose of selling counterfeit and infringing medicine, including Gilead-branded HIV medicines, to real pharmacies online.

### 2.    The Lumix Defendants

104.    Ariel Levy registered Lumix as a retail pharmacy in Woodhaven, Queens, New York on March 21, 2025.

105.    But while Lumix is registered as a retail pharmacy, its supervising pharmacist Galanti resides in Naples, Florida—more than 1,200 miles away from the pharmacy.  New York law requires a supervising pharmacist to work full-time at the pharmacy, which is not possible if Galanti lives in Naples.

26

### a.    Lumix's Sale of Counterfeit and Infringing HIV Medicines

106.    In December 2025, a cooperating pharmacist in this District searched for Gilead-branded medicines sold on Rxeed.  Listed was a unit of BIKTARVY® available at $3,600.00, representing an approximate 15% discount below WAC, and a unit of DESCOVY® available at $1,700.00, representing an approximate 23% discount below WAC.  The cooperating pharmacist purchased both units and when they arrived, the invoices indicated that Lumix was the seller.

107.    The bottle of BIKTARVY® arrived visibly dirty and damaged, with clear signs of being previously dispensed to a patient.  A white line appeared through the bottle's expiration date, consistent with peeling from the removal of a pharmacy-applied patient label.  The bottle also was missing the Patient Information outsert, with the two glue dots used to affix the outsert still present.





108.    The bottle of DESCOVY® also arrived missing its outsert, but with the two glue

dots remaining.  The bottle was dirty and had significant residue, consistent with damage that

results from the removal of a pharmacy-applied patient label.



109.    A trace of the serial numbers on each of the bottles confirmed that they had

previously been sold through the legitimate supply chain to pharmacies other than Lumix.

Gilead's records confirmed it had sold the unit of BIKTARVY® to Gilead-authorized distributor

Cardinal, which confirmed it had sold that unit to an unrelated independent pharmacy in

Brooklyn.  Gilead's records confirmed it had sold the unit of DESCOVY® to Gilead-authorized

distributor McKesson, which confirmed it had sold that unit to a pharmacy in North Miami Beach, Florida.

110.    In January 2026, a cooperating pharmacist in this District performed another search for BIKTARVY® on Rxeed.  The cooperating pharmacist found and purchased a unit of BIKTARVY® that was available at $3,600, representing an approximate 15% discount below WAC.  When it arrived, the invoice once again showed that Lumix was the seller.

111.    The bottle of BIKTARVY® arrived visibly dirty and damaged, with clear indicia of having been previously dispensed to a patient.  Consistent with the removal of a pharmacy-applied patient label, there was residue on the original Gilead label above and beneath the barcode, and on the bottle itself, shown in the red circles below.  The bottle was also missing its outsert and retained the two glue dots where the outsert had been affixed.





112.    Gilead's records confirmed it had sold that unit of BIKTARVY® to Gilead-authorized distributor Cardinal, which confirmed it had sold that unit to an independent pharmacy in Bronx, New York.

113.    A cooperating pharmacist also performed a search for DESCOVY® on Rxeed in January 2026, and identified two units offered at $1,700, representing an approximate 23% discount off WAC.  The cooperating pharmacist purchased both units of DESCOVY®, which arrived with an invoice from Lumix.

114.    Both bottles of DESCOVY® arrived visibly dirty and damaged, with clear indications that they had been previously dispensed to patients.  As shown below, the bottle of DESCOVY® bearing serial number 369292659620 had sticky residue on several areas of the bottle, including under the variable-print are of the label; ink from the label had been lifted or

scraped off, including on the words "Descovy tablets";  and the Patient Information outsert was

missing, with the two glue dots used to affix the outsert remaining.



115.    The other bottle of DESCOVY® bearing the serial number 304226586246 also

arrived visibly dirty and damaged, with clear indicia of having been previously dispensed to a

patient.  As shown below, there were several spots of sticky residue and several white dots where

the original label had been damaged and the ink lifted or removed, including on the serial

number, consistent with the removal of a pharmacy-applied patient label.  The bottle was also

missing the Patient Information outsert but had the two glue dots where the outsert had been affixed.



116.     Gilead's records confirmed that it had sold both units of DESCOVY® that the cooperating pharmacist purchased in January 2026 to Gilead-authorized distributor McKesson. McKesson confirmed it had sold the unit of DESCOVY® bearing the serial number 369292659620 to an independent pharmacy in Hialeah, Florida, and the unit of DESCOVY® bearing the serial number 304226586246 to an independent pharmacy in Hallandale, Florida.

117.    The cooperating pharmacist attempted to contact Lumix to request the pedigree information for the Gilead-branded medicines it sold via Rxeed, but the calls went straight to voicemail and were never returned.

118.    Lumix's listings on the Platforms fraudulently advertised the medicines as new, authentic Gilead-branded medicines, and concealed that they had been previously dispensed to patients by other pharmacies.

119.    In sum, through test buys, Lumix sold multiple units of counterfeit and infringing Gilead-branded medicines to a pharmacy in this District that had been damaged and altered to conceal the fact that they had been previously dispensed to patients then re-purchased on the black market.

### b.    Gilead Learns Lumix Is Not an Operating Retail Pharmacy

120.    As part of Gilead's counsel-led investigation, a private investigator visited Lumix's retail store.  Despite it being normal weekday business hours, Lumix was closed, with signage visible on an awning but the pharmacy otherwise completely behind a closed and locked rollcage.




33

121.    The investigator spoke to an employee of a neighboring business about Lumix, who, without prompting, volunteered his opinion that the pharmacy is a "scam." The employee stated that other than putting up the awning and signage for Lumix several months prior, he had never observed anyone entering or exiting the store or seen Lumix open.

122.    In short, Lumix maintains an empty storefront to conceal the fact that it is a non-operational entity that exists for the purpose of selling counterfeit and infringing medicine, including Gilead-branded HIV medicines, to real pharmacies online.

### 3.    The Levy Family Defendants

123.    Lumix is just the latest in a long-running series of Queens-based scam pharmacies operated by members of the immediate family of Ariel Levy. Over at least the past four years, the Levy family has opened at least eight supposed retail pharmacies that are open for mere months, but in their short lifespans sell millions of dollars' worth of counterfeit and infringing Gilead-branded HIV medicines on the online Platforms. On just one Platform from 2022 through 2024, the Levy Family Defendants sold over **$26 million** in counterfeit and infringing Gilead-branded HIV medicines – and that is likely just the tip of the iceberg.

124.    At the head of the scheme are two convicted medical fraudsters: Daniel Levy and Alex Levy, who ran a massive no-fault insurance fraud scheme in New York City. A 2009 indictment alleged that Daniel and Alex Levy ran what it dubbed the "Levy Criminal Enterprise," through which car-accident victims were lured into fraudulent clinics owned by Daniel Levy, who had no medical training, and operated by Alex Levy. Daniel Levy dictated that the victims would receive a predetermined, medically unnecessary course of treatment over several months, whose no-fault insurers were then fraudulently billed, regardless of whether the patients actually received the treatment Levy ordered. Both Daniel and Alex pled guilty to multiple counts of the indictment.

34

125.    Because of their criminal convictions, Daniel and Alex Levy are the only members of the immediate Levy family whose names are not formally affiliated with the rotating series of scam pharmacies the Levy family uses to sell counterfeit and infringing Gilead-branded medicines.  Instead, Daniel and Alex Levy coordinate the opening of scam pharmacies under the name of every other member of their immediate families: Alex Levy's wife (Gerda Shimunova); Alex Levy's son (Benjamin Levy); their sisters (Zoya Meirov and Marina Davidov); their father (Ariel Levy); relation Susana Levy and her son David Levy.

126.    In June 2022, Gerda Shimunova, Alex Levy's wife, registered Galaxy Pharmacy Inc. ("Galaxy"), located at 29-18 Hoyt Avenue South in Astoria, Queens.  Galaxy's license was discontinued approximately 18 months later in December 2023.  During that 18-month period, Galaxy sold at least $5.76 million in Gilead-branded medicines on online Platforms, all at significantly below-WAC pricing.

127.    In July 2023, Benjamin Levy, Alex Levy's son, registered ClearRx Pharmacy Inc. ("ClearRx"), located at 38-76 10th Street in Long Island City, Queens.  ClearRx's license was discontinued approximately thirteen months later in August 2024.  During that 13-month period, ClearRx sold at least $4.05 million in Gilead-branded medicines on online Platforms, all at significantly below-WAC pricing.

128.    In September 2023, Zoya Meirov (née Levy), Ariel Levy's daughter, registered EZ Max Pharmacy Inc. ("EZ Max"), located at 69-39 Myrtle Avenue in Glendale, New York.  EZ Max's license was discontinued approximately ten months later in July 2024.  During that 10-month period, EZ Max sold at least $4.1 million in Gilead-branded medicines on online Platforms, all at significantly below-WAC pricing.

129.   In November 2023, Marina Davidov (née Levy), Ariel Levy's daughter, registered MDRx Pharmacy Inc. ("MDRx"), located at 22-07 Astoria Boulevard in Astoria, New York.  MDRx's license was discontinued approximately five months later, in April 2024.  During that five-month period, MDRX sold at least $2.39 million in Gilead-branded medicines on online Platforms, all at significantly below-WAC pricing

130.   In June 2023, Susana Levy, a relation of the Levy Family, registered SkyRx Pharmacy Inc. ("SkyRx"), located at 29-26 Newtown Avenue in Astoria, New York.  SkyRx's license was discontinued approximately thirteen months later in July 2024.  During that 13-month period, SkyRx sold at least $6.11 million in Gilead-branded medicines on online Platforms, all at significantly below-WAC pricing.

131.   In August 2023, David Levy, an individual who appears to be Susana Levy's son, registered Spectra Pharmacy Inc. ("Spectra"), located at 29-26 Newtown Avenue in Astoria, New York.  Spectra's license was discontinued approximately seven months later in March 2024.  During that 7-month period, Spectra sold at least $3.65 million in Gilead-branded medicines on online Platforms, all at below-WAC pricing.

132.   David Levy was a teenager when he opened Spectra Pharmacy and sold millions of dollars' worth of counterfeit Gilead-branded HIV medicines.  Shortly after Spectra closed, David Levy spent approximately $2.5 million acquiring real estate in Florida.

133.   The Levy Family Defendants' "pharmacy shuffle" scam has continued in recent months.  In December 2025, Ariel Levy opened another scam pharmacy, Prime Well Pharmacy Inc. ("Prime Well"), at 12-07 Astoria Boulevard, Astoria, New York.  As part of Gilead's counsel-led investigation, a private investigator visited Prime Well's retail store, and found a new sign for Prime Well had been hung above an otherwise empty storefront.

36

134. The use of a rotating series of fly-by-night companies, each nominally owned by a different person, is a known technique used by pharmaceutical counterfeiters to evade detection and limit their exposure. By selling their counterfeits on walled-off pharmacy-to-pharmacy online Platforms, the Levy Family Defendants added another layer of secrecy and deception to their scheme.

### 4. The Linden Defendants

135. Abramov registered Linden as a retail pharmacy in Elmont, New York on April 29, 2005.

136. In violation of New York law, Linden has no registered supervising pharmacist.

### a. Linden's Sale of Counterfeit and Infringing HIV Medicines

137. In January 2026, a cooperating pharmacist in this District performed a search for BIKTARVY® on RxPost. There was a unit of BIKTARVY® listed for $2,284.00, representing an approximate 46% discount off WAC. The cooperating pharmacist purchased the BIKTARVY® and it arrived with an invoice from Linden.

138. The bottle of BIKTARVY® arrived visibly dirty and damaged, with clear signs that it had previously been dispensed to a patient. There was significant sticky residue on the bottle and original Gilead label; there was significant lifting of ink on the variable-print area of the bottle, and the product identifying information was smudged, consistent with the use of a

solvent to remove a pharmacy-applied patient label; and the Patient Information outsert was missing.



139.    In January 2026, a cooperating pharmacist in this District also performed a search for BIKTARVY® and DESCOVY® on InStockRx.  The listings included a unit of BIKTARVY® for $3,498.00, representing an approximate 17% discount off WAC, and a unit of DESCOVY® for $1,548.00, representing an approximate 30% discount off WAC.  The cooperating pharmacist purchased both units, and they arrived with invoices from Linden.

140.    The bottle of BIKTARVY® arrived visibly dirty and damaged, with significant sticky residue on the bottle consistent with the removal of a pharmacy-applied patient label, and

with the Patient Information outsert missing but the two glue dots used to affix the outsert remaining on the bottle.



141.     The bottle of DESCOVY® the cooperating pharmacist purchased in January 2026 from Linden via InStockRx also arrived visibly damaged and dirty, with clear signs that it had been previously dispensed to a patient.  As shown below, the label had significant sticky residue

and lifted ink consistent with the removal of a pharmacy-applied patient label and two glue dots

where the missing Patient Information outsert had previously been attached.



142.    Gilead's records indicated that it sold to Gilead-authorized distributor Cardinal

both the BIKTARVY® and the DESCOVY® that the cooperating pharmacist had purchased from

Linden in January 2026.  Cardinal confirmed it sold the unit of BIKTARVY® to a medical

institution in Newark, New Jersey and the unit of DESCOVY® to an independent pharmacy in

Miami, Florida.

143.  The cooperating pharmacist attempted to contact Linden to request the pedigree information for the Gilead-branded medicines, but the calls went straight to voicemail and were never returned.

144.  Linden's listings on the Platforms fraudulently advertised the medicines as new, authentic Gilead-branded medicines, and concealed that they had been previously dispensed to patients by other pharmacies.

145.  In sum, through test buys Gilead has confirmed that Linden sold multiple units of counterfeit and infringing Gilead-branded medicines to a pharmacy in this District that had been damaged and altered to conceal the fact that they had been previously dispensed to patients and purchased on the black market.

### b.      Gilead Discovers Linden Is Not an Operating Retail Pharmacy

146.  As part of Gilead's counsel-led investigation, a private investigator visited Linden's retail store.  Despite it being normal weekday business hours and within Linden's posted business hours, Linden was closed, and its windows were entirely covered in an opaque covering, such that the interior of the store was completely out of view.

 

147.    The investigator spoke to an employee of a neighboring business about Linden, who confirmed he had never seen Linden open and had never observed anyone entering or exiting the store.

148.    In short, Linden maintains an empty storefront to conceal the fact that it is a non-operational entity that exists for the purpose of selling counterfeit and infringing medicine, including Gilead-branded HIV medicines, to real pharmacies online.

### 5.    The Michael's Pharmacy Defendants

149.    Michael's Pharmacy is a retail pharmacy located in Newark, New Jersey.

150.    Kaldas is the owner of Michael's Pharmacy and registered it as a pharmacy in September 2016.

151.    However, Michael's Pharmacy closed its doors as of March 20, 2026, according to signage at its old location.  Its pharmacy license was discontinued on that same date.



152.    In February 2026, a cooperating pharmacist conducted a search for DESCOVY® on RxWorld.  Among the offerings was a listing for DESCOVY® for $1,840.00, representing an approximate 16% discount off WAC.  The cooperating pharmacist purchased the unit of DESCOVY®, and when it arrived, the accompanying invoice indicated Michael's Pharmacy as the seller.

153.    As shown below, the bottle of DESCOVY® arrived missing its Patient Information outsert and had two glue dots where the outsert had been previously attached to the bottle.



154.    Separately, in March 2026 Gilead received a counterfeit unit of BIKTARVY® from Michael's Pharmacy – but not from an online Platform.  Rather, Michael's Pharmacy initiated a product return for a unit of BIKTARVY® with the lot number CGWGYA and serial number 100016091044.  The expiration date appearing on the label read January 2026, meaning the bottle had expired two months prior and was still eligible for Gilead's return program.

155.    But that was not the real expiration date.  Gilead's records show that the real expiration date for that unit of BIKTARVY® – as for all units in lot number CGWGYA – was

43

January 2024.  Michael's Pharmacy had intentionally altered the expiration date on the bottle to artificially extend the shelf-life of the product for two years past its actual expiration date.

156.    On the bottle of BIKTARVY® returned by Michael's Pharmacy, the digit "6" in the expiration date "2026" is faint when compared to the rest of the text in the variable-print area, demonstrating that the date was altered.



157.    In addition, the information Michael's Pharmacy provided with its product return listed a fake transaction history: Michael's Pharmacy claimed to have purchased the unit of BIKTARVY® from Gilead-authorized distributor McKesson, but Gilead's internal records showed Gilead had never sold any units from that particular lot to McKesson.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(A))**
**(Against all Defendants)**

158.    Gilead realleges and incorporates by reference the paragraphs above as if fully set forth herein.

159.    In violation of 15 U.S.C. § 1114(1)(a), Defendants, independently and in conspiracy with one another, used in commerce, without Gilead's consent, either a reproduction,

counterfeit, copy or colorable imitation of the Gilead Marks and the Gilead Trade Dress in connection with the sale, offering for sale, distribution, or advertising of counterfeit Gilead products; in connection with the sale, offering for sale, distribution, or advertising of Gilead products that have been previously dispensed, repurchased, and resold as if they were new when they are in fact materially different from authentic Gilead products authorized for sale by Gilead in the United States and that are not subject to and subvert Gilead's quality-control measures; and in connection with which such use that is likely to cause confusion, or to cause mistake, or to deceive.

160.    Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

161.    Defendants are directly, contributorily, and vicariously liable for their infringement.

162.    As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

163.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

164.    As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## SECOND CLAIM FOR RELIEF
## <u>FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(B))</u>
### (Against all Defendants)

165.    Gilead realleges and incorporates by reference the paragraphs above as if fully set forth herein.

166.    In violation of 15 U.S.C. § 1114(1)(b), Defendants, independently and in conspiracy with one another, reproduced, counterfeited, copied, or colorably imitated the registered Gilead Marks and Trade Dress belonging to Gilead and applied such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the offering for sale, distribution or advertising of counterfeit Gilead products; in connection with the sale, offering for sale, distribution, or advertising of Gilead products that have been previously dispensed, repurchased, and resold as if they were new when they are in fact materially different from authentic Gilead products authorized for sale by Gilead in the United States and that are not subject to and subvert Gilead's quality-control measures; and in connection with such use that is likely to cause confusion, to cause mistake, or to deceive.

167.    For example, and without limitation, the Defendants used counterfeit, reproduced, copied, or colorably imitated Gilead Marks on the labels of the materially different bottles of Gilead-branded HIV medicines they repurchased, advertised, and sold.

168.     Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

169.    Defendants are directly, contributorily, and vicariously liable for their infringement.

170.    As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

171.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

172.    As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

**THIRD CLAIM FOR RELIEF**
**FALSE DESCRIPTION AND DESIGNATION OF ORIGIN IN COMMERCE**
**(Against all Defendants)**

173.    Gilead realleges and incorporates by reference the paragraphs above as if fully set forth herein.

174.    In violation of 15 U.S.C. § 1125(a)(1)(A), Defendants, independently and in conspiracy with one another, in connection with the counterfeit Gilead medicine, and in connection with the sale, offering for sale, distribution, or advertising of Gilead products that have been previously dispensed, repurchased, and resold as if they were new when they are in fact materially different from authentic Gilead products authorized for sale by Gilead in the United States and that are not subject to and subvert Gilead's quality-control measures, used in commerce a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which was or is likely to cause confusion or to cause mistake, or to deceive as to an affiliation, connection, or association with Gilead.

175. Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

176. Defendants are directly, contributorily, and vicariously liable for their infringement.

177. As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

178. Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

179. As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

**FOURTH CLAIM FOR RELIEF**
**<u>FEDERAL FALSE ADVERTISING</u>**
**(Against all Defendants)**

180. Gilead realleges and incorporates by reference the paragraphs above as if fully set forth herein.

181. In violation of 15 U.S.C. § 1125(a)(1)(B), Defendants, independently and in conspiracy with one another, in connection with the sale of counterfeit Gilead-branded medicine, and in connection with the sale, offering for sale, distribution, or advertising of Gilead products that have been previously dispensed, repurchased, and resold as if they were new when they are in fact materially different from authentic Gilead products authorized for sale by Gilead in the United States and that are not subject to and subvert Gilead's quality-control measures, used a

48

slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, and qualities of the counterfeit Gilead-branded medicine.

182. Defendants advertised, marketed, and promoted the counterfeit Gilead products, and the materially different Gilead products with altered, falsified, and/or nonexistent pedigrees, to the public, and/or to specific segments of the public, using the Gilead Marks and Trade Dress, as well as other intellectual property belonging to Gilead.

183. Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

184. Defendants are directly, contributorily, and vicariously liable for their infringement.

185. As a direct and proximate result of Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry. Unless Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

186. Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

187. As a direct and proximate result of Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## FIFTH CLAIM FOR RELIEF
## NEW YORK DECEPTIVE BUSINESS PRACTICES
### (Against all Defendants)

188.    Gilead realleges and incorporates by reference the paragraphs above as if fully set forth herein.

189.    In violation of New York General Business Law § 349, Defendants, independently and in conspiracy with one another, are selling, offering for sale, and/or distributing counterfeit, altered, and/or falsified products unlawfully bearing the Gilead Marks and Trade Dress.

190.    As a direct and proximate result of Defendants' deceptive conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

191.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

## SIXTH CLAIM FOR RELIEF
## COMMON-LAW UNFAIR COMPETITION
### (Against all Defendants)

192.    Gilead realleges and incorporates by reference the paragraphs above as if fully set forth herein.

193.    In violation of the common law of the State of New York and elsewhere, Defendants, independently and in conspiracy with one another, have unfairly competed with Gilead by selling the counterfeit, altered, and/or falsified products.

194.    As a direct and proximate result of Defendants' unfair competition, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in

the industry.  Unless Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

195.   Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if Defendants' acts are allowed to continue.

196.   As a direct and proximate result of Defendants' unfair competition, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## SEVENTH CLAIM FOR RELIEF
## COMMON-LAW UNJUST ENRICHMENT
### (Against all Defendants)

197.   Gilead realleges and incorporates by reference the paragraphs above as if fully set forth herein.

198.   By selling the counterfeit, altered, and/or falsified products bearing Gilead's valuable trademarks independently and in conspiracy with one another, Defendants have been unjustly enriched at Gilead's expense in violation of the common law of New York and elsewhere.

199.   Under principles of equity, Gilead is entitled to restitution and/or disgorgement of Defendants' ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, Gilead demands judgment against Defendants as follows:

A.   preliminarily and permanently enjoining, each and every one of the Defendants and their subsidiaries, parents, affiliates, agents, servants, employees, members, directors, officers, and attorneys, and those persons in active concert or participation with them:

51

(i)  from selling any Gilead-branded medicine, whether genuine or counterfeit;

(ii)  from using any of the Gilead Marks and Trade Dress or any marks confusingly similar thereto in connection with the manufacture, sale, offer for sale, distribution, advertisement, or any other use of medication;

(iii)  from using any logo, trade name, or trademark confusingly similar to any of the Gilead Marks and Trade Dress, which may be calculated to falsely represent or which has the effect of falsely representing that the services or products of Defendants or of others are sponsored by, authorized by, or in any way associated with Gilead;

(iv)  from directly, contributorily, and vicariously infringing any of the Gilead Marks and Trade Dress;

(v)  from otherwise unfairly competing with Gilead in the manufacture, sale, offering for sale, distribution, advertisement, or any other use of Gilead-branded medicines;

(vi)  from falsely representing themselves as being connected with Gilead or sponsored by or associated with Gilead or engaging in any act which is likely to cause the trade, retailers, and/or members of the purchasing public to believe that Defendants, or any of them, are associated with Gilead;

52

(vii)    from using any reproduction, counterfeit, copy, or colorable imitation of any of the Gilead Marks and Trade Dress in connection with the publicity, promotion, sale, or advertising of medications;

(viii)    from affixing, applying, annexing or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being authentic Gilead-brand medicine and from offering such goods in commerce;

(ix)    from destroying any records documenting the manufacture, sale, offer for sale, distribution, advertisement, or receipt of any product purporting to be Gilead-branded medicine; and

(x)    from assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (ix) above; and

B.    ordering that, within fifteen days after the entry and service of a preliminary or permanent injunction, Defendants serve and file a written report under oath setting forth in detail the manner and form in which they have complied with the injunction; and

C.    ordering that all infringing material be turned over, seized, impounded, and/or destroyed; and

D.    awarding to Gilead punitive damages from each Defendant in an amount to be ascertained at trial, but in no event less than $25 million; and

53

E.      awarding to Gilead statutory, actual damages, or threefold damages in an amount to be ascertained at trial, and costs and attorney's fees; and

F.      awarding to Gilead an accounting, and an award of all ill-gotten profits from Defendants' manufacture, sale, and/or distribution of the counterfeit and infringing products, and Gilead's remedial costs; and

G.      awarding to Gilead pre-judgment and post-judgment interest; and

H.      awarding such other and further relief to Gilead as may be just, proper, and equitable.

## <u>JURY DEMAND</u>

Gilead hereby demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all claims and issues so triable.

*[intentionally left blank]*

Dated:      New York, New York
April 14, 2026

PATTERSON BELKNAP WEBB & TYLER LLP

By: _____

Geoffrey Potter
Timothy A. Waters
Isaac J. Weingram
Caroline Zielinski
Anna Petrocelli
1133 Avenue of the Americas
New York, NY 10036-6710
T: 212-336-2000
F: 212-336-2222
E: gpotter@pbwt.com
   twaters@pbwt.com
   iweingram@pbwt.com
   czielinski@pbwt.com
   apetrocelli@pbwt.com

*Attorneys for Plaintiffs*
*Gilead Sciences, Inc. and Gilead Sciences Ireland UC*