Case No. 2:17-CV-01338-NGG-ARL

ALAN L. FRANK LAW ASSOCIATES, P.C.,

    Plaintiff,

    v.

OOO RM INVEST, *et al.*,

    Defendants.

_____/

OOO-RM INVEST, VARWOOD HOLDINGS LTD.
and TCAHAI HAIRULLAEVICH KATCAEV,

    Counter Plaintiffs,

    v.

ALAN L. FRANK LAW ASSOCIATES, P.C.
ALAN L. FRANK and EUGENE A. KHAVINSON,

    Counter Defendants

_____/

Counter Defendants, ALAN L. FRANK LAW ASSOCIATES, P.C. and ALAN L. FRANK

(collectively known as the "Frank Parties"), by and through the undersigned attorneys, hereby file

this Motion to Preclude the Opinions of Counter/Plaintiffs' Damages Expert Boris Yatsenko[1] and

as grounds state:

## **INTRODUCTION**

---

[1] The Deposition transcript of Boris Yatsenko dated September 24, 2019 is attached as Exhibit A to this Motion and includes the June 17, 2019 Report of Mr. Yatsenko at Exhibit 2 to the deposition, as well as his curriculum vitae at Appendix B of his report.

This legal malpractice and interpleader action arises from a Settlement Agreement negotiated on behalf of the Counter Plaintiffs[2] (hereinafter the "Settling Parties"), and by the Frank Parties. When the Settling Parties and other individuals could not agree as to the distribution of the net settlement proceeds of approximately $2.3 million, the Frank Parties filed an interpleader complaint. In turn, the Settling Parties filed a counterclaim for legal malpractice and breach of fiduciary duty. Despite wide ranging latitude afforded throughout this nation to interpleading Plaintiffs to pay disputed funds into Court in the event of a dispute as to who is to receive the funds[3], the Settling Parties posit that because the Frank Parties failed to properly distribute the settlement funds in a timely fashion, the Settling Parties were precluded from procuring investment opportunities and thereby lost potential benefits and profits.

To bolster their damages' argument, the Settling Parties retained a Moscow-based physicist and economist from Ernest & Young, Boris Yatsenko. This supposed expert's measure of damages consists entirely of allegedly lost future profits. But the allegedly lost future profits, in turn, rest on rank speculation - - layering conjecture and multiple and successive hypothetical transactions and conclusions, one on top of the other, without offering any proof whatsoever of any - - let alone all - - of the underlying assumptions.

Through pure fantasy, and certainly not based on any proof whatsoever, this so-called expert concludes that the Settling Parties could have somehow turned their (pre-tax)[4] $2.3 million

---

[2] The Settling Parties are OOO RM-Invest and Varwood Holdings Ltd. (collectively the "Company") and Tcahai Hairullaevich Katscaev.

[3] *See Madison Stock Transfer, Inc. v. Exlites Holdings Inter., Inc.*, 368 F.Supp.3d 460, 477 (E.D.N.Y. 2019) ("As long as the stakeholder has a good faith basis to fear double liability, interpleader is appropriate."); *New York Life Ins. Co. v. Apostolidis*, 841 F. Supp.2d 711, 721 (E.D.N.Y. 2012); *Orseck, P.A. v. Servicious Legales De Mesoamerica S. De R.L.*, 699 F.Supp.2d 1344, 1349 (S.D.Fla. 2010) ("Further, the Supreme Court has stated that the federal interpleader statute is 'remedial and to be liberally construed.'" *State Farm Fire & Cas. Co. v. Tashire* 386 U.S. 523 (1967)).

[4] In his calculations, Mr. Yatsenko even forgot to reduce the $2.3 million by applicable Federal income taxes of at least $1 million using then applicable Federal income tax rates. The expert also assumes that the Settling Parties would have received one hundred (100%) percent of the settlement proceeds without reduction for amounts payable to the remaining contestant parties.

settlement recovery into over $21 million in just three (3) short years. And, further, the expert states that he believes that the Settling Parties would have been able to enter into over fifty (50) new contracts even though the expert quite clearly concedes that he has *never* reviewed a single one of the would be contracts.[5] And the expert accepts, again, without any reservation or proof, his client's pure speculation that there would have been new business. This new business is based on pure conjecture - - and his client's instructions - - that his client would have earned ten (10%) percent *per month compounded monthly* on investments and multiple successive hypothetical transactions and assumptions.

In connection with these opinions, Tcahai Hairullaevich Katscaev (known as "Zahar"), allegedly instructed Mr. Yatsenko to provide an estimation of the Settling Parties' fantastical losses in connection with the settlement funds. Mr. Yatsenko thereafter simply followed Zahar's fantastical instructions and did the arithmetic computations. No other analysis of any kind or nature was done by Mr. Yatsenko.

Mr. Yatsenko was instructed to assume:

(1)    Lost profit due to the inability to resume the full-scale operating activity starting from December 31, 2015;

(2)    Lost benefit due to the missed opportunity to organize business with Earth Video Camera Inc.[6] as of December, 31, 2015; and

(3)    Cost of the Company and Zahar from January 1, 2016 to May 31, 2019.

---

[5] *See* Footnote 9 and 10 of the Yatsenko Report attached herein and made a part hereof in which Mr. Yatsenko concedes that: "I express no opinion on this assumption since this matter is out of my expertise. I have also been instructed by Zahar not to conduct any market analysis in relation to the possibility of resuming the business."

[6] Per Zahar, who advised Mr. Yatsenko, the Company purportedly had an opportunity to organize a joint business enterprise with Earth Video Camera Inc., a company that streamed images from cameras installed on the International Space Station. However, no formal agreement was entered to facilitate the joint venture, besides a *non-binding* Letter of Intent. *See* June 17, 2019 Rpt., p. 7.

Rather than evaluate the complete financial history of the Settling Parties, or conduct any independent evaluations, Zahar provided Mr. Yatsenko with explanations and instructions during various phone calls and email correspondence. By his own admission, Mr. Yatsenko's calculations were based entirely upon unverified assumptions provided by Zahar. For example,

1. The Failed Transaction[7] would have been completed in favor of the Settling Parties by January 1, 2016; and

2. The revenue recognized in January would have been 240 RUB. It would have grown at a rate of 10% per month.

Further troubling, to calculate the lost profits at the end of 2015, Mr. Yatsenko looked at the expenses from 2016 through the end of May 2019 (the date of his report) *rather* than considering the financial viability of the company at the end of 2015. Even more disconcerting, while tasked with valuating the company, Mr. Yatsenko conducted *no* evaluation of the financial history of the Company in the years 2013, 2014, and 2015. In fact, the Settling Parties only provided him with financial records for the years 2011 to 2012.

At this juncture, the Frank Parties move the Court to exclude unsupported and unreliable opinions from the Settling Parties' damages expert, Mr. Yatsenko, under *Daubert* and Federal Rule of Evidence 702. Specifically, this Court must strike Mr. Yatsenko as the Settling Parties' damages expert because he is wholly unqualified to render his opinions, the opinions are based upon nothing but assumptions provided directly by the Settling Parties, and his opinions and his report are based upon nothing but arithmetic that will not assist the trier of fact. For the reasons further argued below, this Court must strike Mr. Yatsenko from rendering any expert opinions related to damages under *Daubert* and Rule 702.

---

[7] Mr. Yatsenko refers to the "Failed Transaction" as the transaction for which the underlying matter involved, which is the basis for this legal malpractice action.

## MEMORANDUM OF LAW

### I.   LEGAL STANDARD

Applicable New York law is crystal clear with respect to the proofs required to support a claim for lost profits, especially when the claim for lost profits has to do with new business. *Kidder, Peabody & Co. v. IAG Int'l Acceptance Group*, N.W., 28 F. Supp. 2d 126, 131-37 (S.D. NY 1998). *Kidder* provides a comprehensive analysis of the law applicable to lost profits and damages in this exact factual setting, for both established and new businesses., at pages 131 thru 137 thereof. In the instant proceeding, just like in *Kidder*, all of the expert's alleged damages are based on new business.

Federal Rule of Evidence 702 governs the admissibility of expert testimony and allows experts to testify only if:

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)   the testimony is based on sufficient facts or data;

(c)   the testimony is the product of reliable principles and methods; and

(d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2019).

Before admitting expert testimony, Rule 702 requires district courts "to ensure the reliability and relevance" of that testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 152 (1999). "And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question,...the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* at 149 (quoting *Daubert*). Although the standards governing the admissibility of opinion testimony under Rule 702 are

somewhat flexible, the court's gatekeeping role requires exclusion if the testimony is based upon speculation and conjecture. *Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC*, 2019 WL 5103870, at *11 (E.D.N.Y. Oct. 11, 2019) (*citing Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008)). In fact, "the district court has broad discretion to carry out this gatekeeping function." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016).

Before a court admits testimony under Rule 720 and *Daubert*, the court must make the following determinations: (a) "'whether the witness is qualified to be an expert; (b) whether the opinion is based upon reliable data and methodology; and (c) whether the expert's testimony on a particular issue will assist the trier of fact.'" *Id.* (*quoting Marini v. Adamo*, 995 F. Supp. 2d 155, 179 (E.D.N.Y. 2014)). The district court "must [also] decide whether a qualified expert's testimony rests on a reliable foundation" rather than on speculation. *CIT Grp./Bus. Credit, Inc. v. Graco Fishing and Rental Tools, Inc.*, 815 F.Supp.2d 673, 676 (S.D.N.Y. 2011). "'Assumptions based on conclusory statement of the expert's client, rather than on the expert's independent evaluation are not reasonable.'" *Id.* (*quoting Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001)). Furthermore, an expert should understand that a party and counsel in litigation has "'an interest in the outcome and that an expert study should not be dependent on the information they supply.'" *Paguirigan v. Prompt Nursing Employment Agency LLC*, 2019 WL 4647648, at * 11 (E.D.N.Y. Sept. 24, 2014) (*quoting Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003)).

The Settling Parties offer Mr. Yatsenko's expert testimony and report and thus bear the burden of establishing admissibility of the expert evidence. *Bermudez v. City of New York*, 2018 WL 6727537, *3 (E.D.N.Y. Dec. 21, 2018).

6

## II. ARGUMENT

### A. Mr. Yatsenko is Unqualified to Render Opinions on Valuation of a Telecommunication Company

Mr. Yatsenko lacks the qualifications to render the opinions in his report, such as:

- The Settling Parties overall losses connected with the Failed Transaction is $21.59 million.

*See* June 17, 2019 Rpt., p. 8.

Highly problematic with his opinions is Mr. Yatsenko's complete lack of formal training or specialized knowledge with accounting or valuation of telecommunication companies that would otherwise qualify him to render this opinion. Mr. Yatsenko is a physicist and economist, with no formal training in accounting, and has never testified in a United States litigation[8]. Other than providing testimony in a London High Court matter, and arbitrations in foreign courts, Mr. Yatsenko has never served and testified as an expert. *See* Sept. 24, 2019 Depo. of Boris Yatsenko, 23:3-7.

Pursuant to Rule 702, the court should admit expert testimony when the witness is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evi. 702. Although a court should evaluate the "'totality of the witness's background when evaluating the witness's qualifications to testify as an expert'" such expert testimony must be limited to that of the witness's area of expertise. *Rosco, Inc. v. Mirror Lite Co.*, 506 F. Supp. 2d 137, 144-45 (E.D.N.Y. 2007). While Mr. Yatsenko undoubtedly has a stellar educational background, including a Ph.D. in physics and economics, the majority of his experience is in appraising oil companies. To that end, Mr. Yatsenko lacks the qualifications and specialized knowledge to serve as a damages expert opining on the valuation of a telecommunications company. *See, e.g., Supply*

---

[8] Before joining Ernst & Young, Mr. Yatsenko worked as a Chief Auditor for an oil and gas company. *See* Mr. Yatsenko's Curriculum Vitae; Sept. 24, 2019 Depo. of Boris Yatsenko, 23:3-7.

*& Bldg. Co.*, 2001 WL 1602976, at *4 (while stricken for other reasons, the court in a breach of covenant of good faith and fair dealings matter brought into question the qualifications of plaintiff's damages expert who held degrees in physics and economics and thus stated "a witness with expertise in accounting would seem to be more useful.").

Indeed, Mr. Yatsenko's training and education is in physics and economics and his specialized expertise is in valuating oil companies. *See* Mr. Yatsenko's Curriculum Vitae. Even more vexing, is that Mr. Yatsenko has never testified in any matter in the United States. *See* Sept. 24, 2019 Depo. of Boris Yatsenko, 23:3-7. Mr. Yatsenko is unqualified to offer expert testimony in this matter as he lacks experience, specialized knowledge, and training as to the purported damages of the Settling Parties' telecommunications company. Because Mr. Yatsenko is unqualified to render the opinions in his report, the Court must preclude him from testifying at trial.

**B.      Mr. Yatsenko's Opinions Are Unreliable**

Assuming *arguendo* the Court deems Mr. Yatsenko qualified to render expert opinions in this case, the Court should nevertheless deem his opinions unreliable since Mr. Yatsenko failed to consider the totality of the Settling Parties' financial history. *Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, 2014 WL 12788845, at *4 (E.D.N.Y. Mar. 31, 2014) (noting that when a court deems an expert qualified, it "must then consider whether the challenged opinion has the indicia of reliability listed in Rule 702."). Federal courts have agreed that the court's gate-keeping role applies equally to damages experts providing technical and specialized knowledge, like Mr. Yatsenko. *MTX Comm. Corps. V. LDDS/WorldCom, Inc.*, 132 F.Supp.2d 289, 292 (S.D.N.Y. 2001) (*citing Brooks v. Outbound Marine, Corp.*, 234 F.3d 89, 91 (2d Cir. 2000)). Although seemingly obvious, when an expert is valuing a business, the company's financials are critical and must be considered. *MTX Comm. Corps.*, 132 F.Supp.2d at 289 (holding that an expert's opinions about a company's growth were unreliable and thus excluded since the expert failed to consider

all of the company's financials).  As Mr. Yatsenko neglected to consider the complete financial history of the Settling Parties (as illustrated below), his opinions are unreliable.

In *MTX Comm. Corps* v. *LDDS/WorldCom, Inc.*, during the trial for an alleged Federal Communications Act violation, the court precluded the testimony about the plaintiff's growth and valuation from the plaintiff's damages expert. *Id.* at 290. After only analyzing the scant financial information provided to him by his client—like two years of financials, bills rather than receipts, and conversations with the plaintiff's president about the financial condition of the company—the court highlighted the substantial unreliability of the expert's opinions and stated:

> Common sense and experience, as well as the flexibility afforded me by Daubert and its progeny, dictate that financials and quality of management—particularity of a start-up company—must be considered in valuing a company and its probability of success. **It makes little, if no sense at all, to consider a company's lifeline in a vacuum.** Every business, after all, is subject to economic downturns, marginal mistakes, or, even, natural disaster. **West's failure to include these factors, as well as to even consider learning how much actual money was taken in by MTX via true-up, renders his valuation unreliable and unfit for the jury's consideration.**

*Id.* at 291-92 (emphasis added).

The circumstances here are the same.  Mr. Yatsenko was only provided with the financial data for the years' deemed relevant by the Settling Parties.  *See* Sept. 24, 2019 Depo. of Boris Yatsenko, 31:3-19; 34:5-15.  In fact, Mr. Yatsenko testified in pertinent part as follows:

> Q.  What accounting or financial records were you provided for by the company?
>
> A.  **Well, we had the loss and revenue report, we had the balance sheets, but <u>we didn't do due diligence</u>. We only answered the questions that the client gave us to answer. And in order for us answer these questions, the client provided us with information.**
>
> Q.  I'm not sure you understood my question sir. What I'm trying to find out is what financial records of the company did you review?

9

A.   Well, like I said before, **the company provided us with the data from accounting balance sheets, from the loss and revenue report, and some explanation of some of the points in this sheet. <u>And also the company didn't provide us with data for all the years, only for relevant years.</u>**

Q.   I'm going to ask you about that next. What was the years that you were provided data for?

A.   **<u>Well, we were provided with data from 2011 to 2012</u>**. Some of the detailed breakdown was for 2010, 2018, but like I said before, the scope of our work is mentioned in our report and we didn't go outside the scope of our work.

\* \* \*

Q.   Wouldn't it be important for you to determine lost profit as of the end of 2015, to know the financial viability of the company at that time in 2015, and prior?

A.   Well, so when I did our exercise on lost profit, **<u>we assumed</u>** that if the company would work as it did before, you know, at full capacity, we calculated the profits and expenses for 2012, which was, you know, a model year for the company, when the company worked independently. Then we looked at the business model for 2016, 2019.

*Id.* at 30:20-25; 31:3-19; 34:5-15 (emphasis added).

Mr. Yatsenko's clear lack of consideration of the totality of the Settling Parties' financial history, and the assumptions provided to him by Zahar, demonstrates the indicia of unreliability trial courts must safeguard against. *See e.g., Supply & Bldg. Co.*, 2001 WL 1602976, at \*4 (finding the opinions of plaintiff's damages expert unreliable and noting "Plaintiff does not and cannot cite a place in the record demonstrating [the expert] reviewed [plaintiff's] records rather than relying on his client's conclusory statements."). Although Mr. Yatsenko notes the financial data for the years 2013, 2014, and 2015 is outside the scope of his retention, evaluating the financials for a company in a vacuum, would deem his opinions unreliable at the onset and therefore should be excluded by this Court. *See id.*

**C.    The Expert Testimony is Nothing But "Analytical Gaps" and Therefore Inadmissible**

Mr. Yatsenko's opinions are mounted upon assumptions and are therefore unreliable. *Zsa Zsa Jewels, Inc.*, 2019 WL 5103870, at *11. "'Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" *Id.* (*quoting General Elec. Co. v. Joiner*, 522 U.S. 136, 148 (1997)). Indeed, federal courts have routinely excluded expert evidence when the opinions are founded upon assumptions provided by their clients, rather than conducting their own independent analysis. *Id.* (excluding expert testimony wherein the expert based opinion on the client's assumptions rather than own independent analysis); *Artist Records LLC v. Usenet.com, Inc.*, 608 F.Supp.2d 409, 430 (S.D.N.Y. 2009) ("An expert who simply repeats the hearsay of the client who retained him, without any independent investigation or analysis, does not assist the trier of fact in understanding matters that require specialized knowledge."); *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *6 (S.D.N.Y. Sept. 15, 2003) (excluding expert testimony in part for failing to conduct independent analysis to confirm the information provided by client).

*Lost Contracts*

To start, the entirety of Mr. Yatsenko's conclusions are based wholly upon unfounded assumptions provided by Zahar, which were neither verified nor based upon Mr. Yatsenko's independent evaluation. *See* June 17, 2019 Rpt., p. 6; 11. As part of his assignment, Mr. Yatsenko was instructed by Zahar to calculate "[lost] profit due to the Company's inability to resume the full-scale operating activity starting from [December 31, 2015]." *Id.* at 5.

In *CIT Grp/Bus. Credit, Inc.*, the court precluded the testimony from the defendant's expert on lost profits stemming from the plaintiff's "failed acquisition of two companies." 815 F.Supp.2d 673, 676 (S.D.N.Y. 2011). To determine the impact of the failed acquisitions on lost profits, the

expert noted a $6 million target price for one of the target companies but presumed that the plaintiff would have paid only $5 million to acquire the company. *Id.* This assumption was based solely upon the expert's conversations with plaintiff's management about the projected acquisition price, rather than the expert's own independent analysis. *Id.* Likewise, as to the other failed acquisition, the expert noted that plaintiff would have purchased the second target company for $5.5 million, notwithstanding its valuation of "$8.3 to $10.5 million by an outside firm," based upon plaintiff's inclination that it could have closed for this amount. *Id.* Since the expert's opinion about lost profits stemming from the failed transactions was based on "his client's unrealistic assumptions as to purchase price and not on his own independent evaluation," as well as "'conclusory statements of [plaintiff's] management, and not on his own independent evaluation of the facts,'" the court deemed the expert's testimony regarding lost profits from the failed transactions inadmissible.

Similar is the case here. To present his calculation of lost profit, Mr. Yatsenko blindly relied upon a list of fifty contracts allegedly lost due to the Failed Transaction. *Id.*; *see* Sept. 24, 2019 Depo. of Boris Yatsenko, 69: 25; 70: 1-14. Yet, Mr. Yatsenko never reviewed the actual contracts to evaluate the contracts' viability and potential for continuation[9]. Sept. 24, 2019 Depo. of Boris Yatsenko, 69: 25; 70: 1-14. According to Zahar, "he always had an opportunity to renew th[e] contracts." *See* June 17, 2019 Rpt., p. 11, fn. 9. Mr. Yatsenko testified that he failed to review any of the fifty contracts to confirm Zahar's assumptions. Mr. Yatsenko testified:

> Q. Okay. Let's turn to paragraph 2.1. You state that you present your calculation of lost profit, arising from the company's inability to resume its full-scale operating activity due to the failed transaction. You say, see a list of lost contracts in appendix C. The lost company's contracts that are set forth in appendix C, where did you obtain that information?
>
> A. Well, obviously, this information was given to us by the client.

---

[9] Mr. Yatsenko's consideration of the Settling Parties' contract with Net Element International Inc. is moot as the contract is no longer in existence following the Failed Transaction since it was the basis for the underlying lawsuit, for which the Frank parties provided representation.

Q. Did you ever review any of these contracts that are listed in appendix C?

A. No, the contracts themselves were never provided to us. We were provided with a list of contracts.

Q. Do you know whether any of these contracts expired on their own terms prior to December 31, 2015?

A. Well, we asked this question to the client and the client said that in that list **there are some contracts that expires, but having this financial resource that we are talking about, it's easy to renew those contracts with those companies, if you have financial resources.**

*See* Sept. 24, 2019 Depo. of Boris Yatsenko, 69: 25; 70: 1-25. (emphasis supplied).

Without independently evaluating the "lost contracts," Mr. Yatsenko systematically ignored any consideration of the contracts' viability, and instead, assumed the Failed Transaction propelled the discontinuation of the fifty contracts. But, by ignoring the factual backdrop of the contracts (such as profitability and valuation), Mr. Yatsenko presumes that the contracts would have renewed but for the Failed Transaction, solely based upon his conversation with Zahar. It is axiomatic that short of evaluating the substance of the fifty contracts, Mr. Yatsenko has not analyzed what the Settling Parties lost, if anything at all. Mr. Yatsenko's report is devoid of any mention of unsuccessful purchase orders or lost customers due to the Failed Transaction. *See CIT Grp/Bus. Credit, Inc. v. Graco Fishing and Rental Tools, Inc.*, 815 F.Supp.2d at 677. Specifically, Mr. Yatsenko's opinions are based upon assumptions fed to him by Zahar (that the contracts would perpetually continue) rather than Mr. Yatsenko's independent evaluation of the contract terms, substance, and viability. As such, Mr. Yatsenko's opinions are unreliable.

*Growth Rate*

In the same vein, in order to further calculate lost profits, Mr. Yatsenko used other assumptions provided by Zahar including a 10% per month growth rate and estimated the Settling

Parties' lost profit at $13 million. *See* June 17, 2019 Rpt., p. 12. To arrive at his calculations, Mr. Yatsenko assumed the company would be able to resume full operations in January 2016:

> Q. Sir, my question is very simple: Did you assume for purposes of your report, an opinion that the company would be able to resume operations in January of 2016? Yes, or no?
>
> A. **Yes, it was an assumption that we used. This assumption was based on the instructions provided by our client.**
>
> Q. And if I follow what you also told me, you did not do anything to verify independently whether the company would be able to resume operations in January 2016, correct?
>
> A. **Yes, we did not do such an analysis. It wasn't in the scope of our work.**

*See* Sept. 24, 2019 Depo. of Boris Yatsenko, 38: 12-24 (emphasis added).

*No Market Analysis*

Equally alarming, Mr. Yatsenko's focal calculation for his assignment, lost profits, was based upon assumptions provided by Zahar:

> Q. So when you did your lost profit analysis, you started with the assumption that the company had zero in its bank, correct?
>
> A. Yes, **there was an assumption** at the end of December 2015 and the beginning of January 2016, that there was either zero amount in the bank account or an insignificant amount in the bank.
>
> Q. In order to do your lost profit analysis, **you also assumed** that as of the end of December 31, 2015 that the company had no prior debt, correct?
>
> A. Yes.

*Id.* at 58:7-18 (emphasis added).

An expert's lost profits' evidence, which is bred from conclusory statements spewed by the expert's client, rather than independent evaluation, is certainly grounds for exclusion. *CIT Grp./Bus. Credit, Inc.*, 815 F. Supp. 2d at 677–78 (excluding expert's "unrealistic assumptions" on lost profits stemming from conclusory statements provided by client and not independent

confirmation of the facts).  Notwithstanding his acquiesces to Zahar's spoon-fed information, Mr. Yatsenko acknowledged that an independent analysis of the market would certainly "provide a possible foundation to determine if the assumptions [were] correct." *See* Sept. 24, 2019 Depo. of Boris Yatsenko, 67:20-25; 68: 1-4. Recognizing his possible gaffe, Mr. Yatsenko's opinions about the Settling Parties' lost profits certainly cannot be trusted.

### *OOO Arian Contract*

Along the same lines, Mr. Yatsenko was tasked with calculating the lost benefit in the Settling Parties' failure to fulfill certain obligations under a contract with OOO Arian to develop a software application for the company. *See* June 17, 2019 Rpt., p. 32. Pursuant to the terms of the contract with OOO Arian, the work performance was split into two parts along with an advance and final payment. *Id.*  Once again, Zahar provided Mr. Yatsenko with unverified information, without conducting any independent verification:

> Q.    That's what I'm asking you. Well, let's go back, sir. This talks about an advanced payment of 19.9 million that should have been paid the month after the contract was signed. This was money that should have been paid by RM Invest or by Arian?
>
> A.    This was an advance payment. According to which Arian was supposed to pay 19.92 million rubles to RM Invest.
>
> Q.    Did RM [sic] make that payment in sometime in December of 2015?
>
> A.    **Well, I don't have this information we never were provided the confirmation of this advance payment.**

*See* Sept. 24, 2019 Depo. of Boris Yatsenko, 108: 3-18 (emphasis added).

Likewise, following Zahar's directives, Mr. Yatsenko also failed to consider the roughly 40 million rubles it would cost to perform the contract with OOO Arian. *See* June 17, 2019 Rpt., p. 32.

> Q.    You didn't include any of the costs in order to perform this contract, which would  have yielded 40 million rubles, had it gone forward?

A.     Well, so if you look, I wrote about this in my report on page 32. If you look at page 32, you see that the client was interviewed regarding this issue. And he expressed an opinion that if a company would have operated in the normal course of business, it would be able to go forward with this contract and fulfill this contract regarding the software using its own manpower.

Failing to consider the substantial cost to perform the OOO Arian contract, in conjunction with his failure to verify whether the initial payment was paid to the Settling Parties, exposes the indicia of unreliability Rule 702 seeks to preclude. *CIT Grp./Bus. Credit, Inc.*, 815 F. Supp. 2d at 677–78.

**D.     Mr. Yatsenko's Testimony Will Not Assist the Jury**

Testimony pertaining to the Settling Parties' arithmetic, rather than analysis, lacks "meaningful comparative analysis to assist the finder of fact." *CCM Rochester, Inc. v. Federated Investors, Inc.*, 2016 WL 11617452, at *7 (S.D.N.Y. Aug. 31, 2016) (excluding an expert witness whose observations were obvious to a jury). In order to be admissible under Rule 702, "the expert's specialized knowledge must help the trier of fact to understand the evidence." *Id. (citing* Fed. R. Evid. 702). By the same token, an expert "'must have first-hand knowledge of the matter about which he testified, and so testify as a percipient witness, or he must utilize expertise in order to aid the finder of fact in understanding esoteric or complex evidence.'" *Id. (citing Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 3110, 124 (S.D.N.Y. 2015)); *Schwartz v. Fortune Magazine*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000) (excluding a damages expert from testifying because his testimony "was not generated based on any specialized knowledge, but rather involved basis calculations.").

The case of *FPP, LLC v. XAXIS US, LLC*, 2017 WL 11456572, at *1 (S.D.N.Y. 2017 Feb. 13, 2017) is instructive. In that case, the court excluded an expert report proffered by plaintiff which calculated the plaintiff's damages if the defendant were found liable on a theory of fraud.

*Id.* The damages section of the report centered on a calculation, derived from various figures provided to the expert by plaintiff's counsel, who then used simple math to calculate the resulting amount. *Id.* Since the expert engaged in math on "values derived from record evidence" rather than independent analysis, the court deemed the report "unhelpful" and excluded it from evidence as it would not assist a jury. *Id.* at *1-2.

As is the case here, Mr. Yatsenko's anticipated testimony and his report is nothing but a regurgitation of values derived from record evidence furnished by Zahar. By way of example, he testified the scope of his assignment was to conduct calculations:

> Q.   Let's turn to your report on section 1.20. In that section you talk about the fact that you were instructed by the company to conduct calculations in five areas, correct?
>
> A.   Yes, that's exactly right.
>
> * * *
>
> Q.   So to answer my question, did Ernst & Young make any suggestions of areas that should be included in this report, other than the ones that are listed here in numbers one through five?
>
> A.   No, it was beyond our scope.

*See* Sept. 24, 2019 Depo. of Boris Yatsenko, 50:5-23.

And, to perform those calculations, Mr. Yatsenko admittedly only used the assumed values provided by Zahar and depicted below in paragraph 1.29 of Mr. Yatsenko's report:

- The Failed Transaction would have been completed in favor of the Claimants by 1 January 2016;

- The revenue recognized in January would have been RUB 240 mln. It would have grown at a rate of 10% per month until reaching the level of RUB 500 mln per month and remaining at this level afterwards;

- The cost structure would have remained constant, based on the Company's management;

- The company would have terminated its operations as of 31 May 2019.

*See* June 17, 2019 Rpt., p. 6. Yet, even these values were deduced and provided by Zahar, rather than independently verified by Mr. Yatsenko. For example,

> Q.  In paragraph 1.29 you talk about the revenue recognized in January of 2016, would have been 240 million rubles and would have grown at the rate of 10 percent per month. The growth rate of 10 percent per month, where was that information obtained from?
>
> A.  This is according to instructions of the client. It's his input.
>
> Q.  Did you see anything in any of the documents that you received that showed that the company, in fact, had a growth rate of 10 percent per month?
>
> A.  **Well, no, we didn't receive the documents confirming this assumption,** but 240 million a month is consistent with the revenue the company was receiving in 2012.
>
> Q.  Did you see anything in the documents that you were provided with, that the company had ever reached a revenue level of 500 million rubles a month?
>
> A.  Well, first of all, we are talking about a hypothetical situation. If the company we – are talking about a hypothetical situation. When the company would get $2.3 million, which it never did, that this is the first point. Then the second point, can I continue?
>
> Q.  Yes.
>
> A.  Well, 500 million rubles revenue a month, **this was an assumption of the client based on his knowledge of the market. And we didn't verify this independently.** We didn't review the market and we didn't do any independent audit of that amount.

*See* Sept. 24, 2019 Depo. of Boris Yatsenko, 66:.8-25; 67:1-14.

Similar to the damages expert in *FPP, LLC,* Mr. Yatsenko performed calculations based upon unverified data provided by Zahar. *Id.* At no point did Mr. Yatsenko perform any independent analysis to authenticate the seemingly high growth rate of 10% per month. Without independently analyzing the data provided by Zahar, and then utilizing such data to attain certain values such as $13 million in lost profits, Mr. Yatsenko's opinions are surely not based upon any

specialized knowledge, but rather just unsubstantiated assumptions. Such assumptions would surely not help the trier of fact to better understand any archaic issues at hand. As such, Mr. Yatsenko's opinions should be excluded.

## III. CONCLUSION

The opinions of the damages expert, Boris Yatsenko, proffered by the Settling Parties should be excluded as the testimony and report are based upon unsupported and unreliable opinions under *Daubert* and Federal Rule of Evidence 702. Based upon the foregoing, this Court must strike Mr. Yatsenko as the Settling Parties' damages expert because he is unqualified to render his opinions, the opinions are based upon unverified assumptions and values, which will not assist the trier of fact. As such, this Court must strike Mr. Yatsenko from rendering any expert opinions related to damages under *Daubert* and Rule 702.

WHEREFORE, Counter-Defendants ALAN L. FRANK LAW ASSOCIATES INC. and ALAN L. FRANK, move for entry of an Order precluding and/or striking the opinion testimony and report of Counter-Plaintiffs' damages expert, Boris Yatsenko, and other relief this Court deems proper.

# CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing was electronically served this **24th** day **of February 2020**, to all counsel or parties of record on the attached Service List.

LITCHFIELD CAVO LLP
Attorneys for Alan L. Frank Law Associates
P.C. and Alan L. Frank, individually
Radice Corporate Center
600 Corporate Drive, Suite 600
Fort Lauderdale, Florida 33334
(954) 689-3000 - Office
(954) 689-3001 – Facsimile
E-Mail: Passaro@litchfieldcavo.com
E-mail: Donaldson@litchfieldcavo.com

By: ___*Geralyn M. Passaro*___
Geralyn M. Passaro, Esq.

## SERVICE LIST

### Alan L. Frank Law Associates, P. C., et al. v. 000 RM Invest, et al.
### Case No. 2:17-CV-01338-NGG-ARL

| Attorneys for Plaintiff Alan L. Frank Law Associates, P.C. | Attorneys for 000 RM Invest, Katcaev & Varwood |
|---|---|
| Alan L. Frank, Esq.<br>Samantha A. Millrood, Esq.<br>Alan L. Frank Law Associates, P.C.<br>135 Old York Road<br>Jenkintown, PA 19046<br>Tel: 215.935.1000<br>E-Mail: afrank@alflaw.net<br>E-Mail: SMillrood@alflaw.net<br>E-Mail: efrank@alflaw.net | Howard R. Behar, Esq.<br>Samuel M. Sheldon, Esq.<br>The Behar Law Firm, P.A.<br>17501 Biscayne Blvd. Suite 460<br>Aventura, FL 33160<br>Tel: 786.735.3300<br>Fax: 786.735.3307<br>E-Mail: sms@beharlegal.com<br>E-Mail: hrb@beharlegal.com<br>E-Mail: np@beharlegal.com |
| | **Attorneys for Counter-Defendant Eugene A. Khavinson**<br><br>Shari Sckolnick, Esq.<br>Michael Furman, Esq.<br>Furman Kornfeld & Brennan, LLP<br>61 Broadway, 26th Floor<br>New York, NY 10006<br>Tel: 212.867.4100<br>Fax: 212.867.4118<br>E-Mail: mfurman@fkblaw.com<br>E-Mail: ssckolnick@fkblaw.com |
| **Attorneys for Counter Defendant Alan F. Frank Law Associates, P.C. & Alan L. Frank, individually**<br><br>Geralyn M. Passaro, Esq<br>Litchfield Cavo LLP<br>Radice Corporate Center<br>600 Corporate Drive, Suite 600<br>Fort Lauderdale, Florida 33334<br>954.689.3000 - Office<br>954.689.3001 – Facsimile<br>E-Mail: Passaro@litchfieldcavo.com<br>E-Mail: spector@litchfieldcavo.com<br>E-mail: Donaldson@litchfieldcavo.com | **Attorneys for Schmdt & Piroznikov**<br><br>Richard J. Mooney, Esq.<br>RJM Litigation Group<br>505 Montgomery Street Floor 11<br>San Francisco CA 94111<br>Tel: 415-30703021<br>E-Mail: Richard.mooney@rjmlitigation.com |